# Exhibit A

## NASD DISPUTE RESOLUTION

| | |
|---|---|
| In the Matter of the Arbitration between | ) |
| | ) |
| **Mark Roven, James Darden III, Rod Butterfield,** | ) |
| **Steve Bares, Jay Magwire, Carolyn Magwire,** | ) |
| **Dorothy McCarty, Richard Teerlink, Elenora** | )  NASD Arbitration No. 67-01307 |
| **Crone, Nellie Morison, Scott M. Crone, Scott R.** | ) |
| **Crone, Nadine Vanderlanes,** | ) |
| Claimants, | ) |
| | )  STATEMENT |
| v. | )  OF CLAIM |
| | ) |
| **Herbert J. Sims & Co.** | ) |
| | ) |
| Respondent. | ) |

Pursuant to the Rules of NASD Dispute Resolution, Claimants allege the following claims against Respondent Herbert Sims & Co.

## PARTIES

Mark Roven is one of many investors who became acquainted with Herbert J. Sims through James Darden, owner of Integrity Financial Management.  Roven is a published poet who devotes much of his time and energy to charitable benefit projects. His artistic and charity work does not provide for a secure financial present let alone future. Mr. Roven's investments sold to his agent by Herbert J. Sims, were of the utmost importance, as they were the only money he had to live on.

Herbert J. Sims & Co. is a 70 year-old investment banking firm and fixed income financial services brokerage headquartered in Southport, Connecticut with eight locations nationwide. It finances senior living facilities and has underwritten over $9 billion in

**Statement of Claim-1**

projects throughout the United States. Herbert J. Sims claims that it is recognized as one

of the leading experts in underwriting financing for the senior living industry.

According to the company itself, Sims and its employees are:

> the experts other bond experts rely on. Sims is a consistent choice of leading Bond Funds and other financial institutions – as well as other astute private investors.

The reasons for their confidence are concrete.

> Our brokers don't simply push paper. Sims actually creates many of the bonds we sell, monitoring each project from the proposal stage to construction to ribbon-cutting. That gives us a depth of understanding, control and troubleshooting ability that generalist brokers, with thousands of bonds to evaluate, simply can't match.

> With Sims' experts doing everything financially and humanly possible to assure our bonds' investment-worthiness, it's no wonder our clients feel they can sit back and relax.

### HEARING LOCATION

The hearing in this matter should be held in San Francisco, California, which is

the hearing location closest to where the majority of claimants reside and also resided

during the relevant time.

### FACTUAL BACKGROUND

James Darden III is a Registered Investment Advisor who was first contacted

about the Regency Point Municipal Bond in March 2002 by Scott Drayer, a broker

working for Herbert Sims & Co. Mr. Drayer stated to Mr. Darden that his bond

department had brought in a couple of a million dollars of a bond issue that had

previously been sold out and unavailable. He then explained the particulars of why this

**Statement of Claim-2**

bond would make a great investment for Mr. Darden's clients, many of whom lived in California. Mr. Drayer touted the advantages of the Regency Point Municipal bond, claiming that it was exempt from federal taxes, and was a very secure investment.

On this last point, Mr. Drayer elaborated that this particular bond was secure in that it had no competition and was affiliated and sponsored by the Baptist Charitable Foundation (the Baptists). The Baptists had made an initial investment of 2.8 million in the project and retained another six million in reserve for the facility, should it require any help in the future. The facility was said to be located within driving distance of two major cities, Birmingham and Atlanta, and situated in an area with major industry, such as Tyson foods, Goodyear Tire, and a Honda automobile factory. This bond had been nearly 100% pre-sold. It was 80% complete, and in addition to the Baptist backing, had two years of capitalized interest reserve, in case of a delay in building.

Mr. Darden asked Mr. Drayer what the debt service was. Mr. Drayer responded that at 85% occupancy it was projected to be 1.40%, and since it was already presold, he felt that they would have no problem reaching that goal. Mr. Darden requested a prospectus, to which Mr. Drayer agreed but added that he didn't know how long the bonds would be around and that if Mr. Darden was interested and had the cash available, he should take immediate advantage of this offer.

Mr. Darden had conducted business before with Mr. Drayer and believed his statements. In light of their prior dealings Mr. Darden had no reason, at that time, to doubt Mr. Drayer's word. Mr. Darden decided to make an initial investment of approximately $500,000 for some of his low risk tolerance clients. By July of 2003, Mr. Darden had bought $495,000 more, making the total ownership of his clients $995,000.

**Statement of Claim-3**

Of this investment made by Darden on behalf of his clients, Mark Roven owned $100,000 in Regency Point bonds.

Mr. Darden followed the progress of the project in the quarterly reports sent to him. In these reports, Mr. Darden discovered that the occupancy figures at Regency Point were unusually low, and immediately called Scott Drayer. Mr. Drayer assured him that there was nothing to worry about, that there had been some trouble with state approvals and final construction problems which had caused Regency Point to fall behind on reaching occupancy goals. Mr. Drayer repeatedly assured Mr. Darden that the Baptists were fully behind the facility and that there was nothing to worry about because any money that Regency Point needed would be provided by The Baptists.

In July of 2004, Mr. Darden made a routine check of his accounts and found that Regency Point's price had dropped about 10%. Mr. Darden again called Scott Drayer and was again told that everything was fine. The bond value continued to decrease, and on September 16th 2004, Mr. Darden called Scott Drayer at Herbert J. Sims & Co. and asked him to get a bid. At first, Mr. Drayer said that his trader was out of town and would have to get back to Mr. Darden the next day. When James Darden called the next day, Mr. Drayer informed him that he didn't know exactly why, but Sims was not bidding on Regency Point at that time. He said that his trader was out of town, visiting Regency Point in fact, and that he would fill Mr. Darden in on the details when his trader returned. He said that he was sure it was just a temporary situation and that he would not advise selling at this point because the facility was going to work out well. Mr. Drayer admitted that the facility was down on occupancy, but also told Mr. Darden that the Baptists had $6,000,000 backing up the facility. Mr. Drayer also told Mr. Darden to remember that he

**Statement of Claim-4**

Compass Law Group PLLC
1200 Fifth Avenue
Suite 1900
Seattle, 98101

bought bonds for the long term and that it was still paying its interest. Mr. Darden responded that he had never bought a bond that was not immediately liquid, and instructed Mr. Drayer to call as soon as his trader returned.

Immediately following his conversation with Mr. Drayer, Mr. Darden called the Trustee of the bond, Sun Trust, and was informed me that Mary Lou Frey had been transferred from handling Regency Point because she was the wife of the Executive Vice President of Sims and that a new Trustee, Katherine Krug, had been appointed. Needless to say, this information came as a shock to Mr. Darden.

From this point on, Mr. Roven and the rest of the Regency Point investors saw their investment in Regency Point deteriorate from bad to worse.  Bond Meetings were held to discuss the before undisclosed problems with Regency Point.   Greystone Management, who had been managing Regency Point, and who had also incidentally done the initial feasibility study in the prospectus that was used to support the financial projections for the financial stability and success of Regency Point, was dismissed from the project.

Regency Point hired its own consultant, Phoenix Partners Inc., owned and operated by Charles Bryan.   At Bryan's suggestion, Regency Point hired Sage Management, a nationally well-respected management company.   Charles Bryan and Sage began their own survey and study to determine why Regency Point was failing. At the bond Meetings Sage reported that it was impossible to run the facility on an Entrance Fee Basis. As Charles Bryan said, they had built a Cadillac in a town that could only afford a Chevrolet. The estimates in the prospectus on housing sale prices, home equity, and eligible people that could afford to move into the facility were simply false. And

**Statement of Claim-5**

Compass Law Group PLLC
1200 Fifth Avenue
Suite 1900
Seattle, 98101

despite the initial description of the facility location, there simply were no larger markets to draw from. For example, it had been claimed that Regency Point could draw on communities such as Birmingham and Atlanta. In reality, however, these cities are not in close enough proximity, with Birmingham over 60 miles away and Atlanta 150 miles away. As for the local community, interviews with qualified prospects revealed that most of the would-be residents viewed Regency Point as a Country Club beyond their means. It was concluded that the only viable alternative for making Regency Point successful was to drop the entrance fee option in favor of a purely rental-based facility.

This suggestion of a rental-based facility was strongly opposed by Bill Sims, who insisted on having more and more studies done. Sims was finally able fire Sage Management and Phoenix Partners thanks to his influential position with the majority bondholders.

Mr. Darden's clients at one point were forced to reluctantly approve of a forbearance agreement enabling Regency Point to pay no interest on the bonds for one year, while another firm with close ties to Sims, Spectrum Consulting, did another study to determine if the facility could be run on an entrance fee basis. This consultation was paid with money from the bond holders' reserve fund.

For Mark Roven, and the other "Darden" investors, Herbert J. Sims' misrepresentation of fact and mismanagement of bondholders' money means that their livelihood is in jeopardy and their investment devastated. Unfortunately, his case is not an isolated one limited to Mark Roven. Other clients of James Darden who have suffered greatly from the Regency Point fraud include Jay and Caroline Magwire. Retired school teachers in their seventies, Jay suffers from severe migraines and a brain tumor, and

**Statement of Claim-6**

Caroline has been battling a debilitating heart condition. Jay had wanted to retire two years ago and is physically incapable of meeting the demands of teaching. However, as a result of the Herbert J. Sims fraud, Jay has been forced to continue working despite great pain.

Stephanie Harper, 73 years old, is another client like Roven who depended on the income generated from her investments to live on since the death of her husband. Similarly, Eleanor Crone is an 84 year-old widow whose husband had handled the finances. Although she has some wealth to work with, Ms. Crone is by no means a sophisticated investor, and a large portion of her portfolio was invested in Regency Point. Often hospitalized and suffering from high blood pressure and overall fragile health, Ms. Crone only agreed to invest in the Herbert J. Sims bond because of the security supposedly offered by the Baptists' involvement.

Mark Roven and the other clients mentioned above have been the victims of a grossly misrepresented investment, and are all suffering needlessly, awaiting the outcome of these claims. James Darden has also been devastated by this scandal. Recommended by a trusted source, the fraudulent Regency Point bond has proved nothing but trouble, bankrupting Integrity Financial Management. Previous to his involvement with Herbert J. Sims in the Regency Point project, Mr. Darden had 75 to 90 clients at a time, many of whom he had worked with for over 26 years. He now has 12 clients. His annual income has dramatically fallen from $175,000 per year to a mere $30,000 annually, and he is fighting to prevent foreclosure on his family's home.

**Statement of Claim-7**

## CLAIMS

## BREACH OF FIDUCIARY AND CONTRACTUAL DUTIES

As a result of the customer relationship between the Claimants on the one hand and Herbert J. Sims on the other, Herbert J. Sims owed the Claimants a strict fiduciary and contractual duty to act in their best interests, to deal fairly and honestly with them, to observe fair business practices and equitable principles of trade as embodied in the standards of the securities industry, the Rules of the NASD, and Herbert J. Sims's own internal policies, to make only suitable investment recommendations to the Claimants agent and not to knowingly or negligently make material misrepresentations and omissions to them. By reason of the fact that Herbert J. Sims solicited and recommended securities to the Claimants' agent, Respondent Herbert J. Sims owed a fiduciary duty to each Claimant - its principal - to act diligently and in the utmost good faith and to act in the best interest of that Claimant. Respondent Herbert J. Sims's fiduciary duty included, *inter alia*:

a. To recommend suitable investment strategies and suitable investments for Claimants.

b. Not to withhold any material information and not to make any misrepresentations to Claimants.

As a result of Respondent Herbert J. Sims's breach of its fiduciary duty to the Claimants, each Claimant was lulled into a false sense of security that Respondent Herbert J. Sims would properly recommend and solicit suitable purchases of investments.

Respondent Herbert J. Sims breached its fiduciary duty to each Claimant by:

**Statement of Claim-8**

Compass Law Group PLLC
1200 Fifth Avenue
Suite 1900
Seattle, 98101

a. Making material misstatements regarding the Regency Point bonds to Claimant's agent;

b. Omitting to communicate material regarding the Regency Point bonds to Claimant's agent when selling said bonds.

As a result of Herbert J. Sims's breach of its fiduciary duty to Claimants, Claimants (excluding James Darden) have suffered damages of approximately $1,000,000.

In committing the acts described in said complaint, Respondent Herbert J. Sims acted despicably and in conscious disregard of its duty to Claimants. Respondent's agent Drayer misrepresented deceived and/or concealed from Claimants' agent material facts known to him with the intention on the part of Respondent's agent Drayer of thereby wrongfully lulling Claimants into a false sense of security that Respondent Herbert J. Sims would recommend suitable investments and investment strategies for Claimants. The conduct of Respondent Herbert J. Sims warrants an assessment of punitive and exemplary damages in an amount appropriate to punish Respondent Herbert J. Sims and deter others from engaging in similar wrongful conduct.

Herbert J. Sims material misstatements also breeched its contract with the Claimants' agent James Darden. At the time Mr. Darden purchased this issue for his clients, he was managing approximately 75 to 90 client's portfolios, and his annual income was between $175,000 and $200,000. As a result of the misrepresentation of the material facts to Darden through Scott Drayer, representing Herbert J. Sims, Mr. Darden's business has been ruined. He now has but twelve clients and manages $1,500,000 in assets. The damage to Mr. Darden's business due to Herbert J. Sims breech

**Statement of Claim-9**

Compass Law Group PLLC
1200 Fifth Avenue
Suite 1900
Seattle, 98101

of contract is approximately $1,000,000.

## CONSTRUCTIVE FRAUD

By reason of the fact that Herbert J. Sims acted as Claimant's agent and fiduciary in recommending the transactions in Claimants' accounts, Respondent Herbert J. Sims owed a duty to the Claimants to act diligently and in the utmost good faith, to act in the best interest of Claimants, and not to take a position contrary to the best interest of the Claimants.

As a result of Respondent Herbert J. Sims constructively defrauding Claimants, each Claimant was lulled into a false sense of security that Respondent Herbert J. Sims would recommend and solicit suitable investments and investment strategies.

In committing the acts described in this complaint, Respondent Herbert J. Sims acted despicably and in conscious disregard of its duty to each Claimant. Respondent's agent Drayer misrepresented, deceived, and/or concealed from each Claimant and their agent material facts known to him or to Herbert J. Sims with the intention on the part of Respondent's agent Drayer of thereby wrongfully lulling each Claimant into a false sense of security that Respondent Herbert J. Sims would properly recommend and solicit suitable investment strategies for each Claimant, when in fact these strategies were to the benefit of Respondent Herbert J. Sims at the expense of each Claimant. The conduct of Respondent Herbert J. Sims warrants an assessment of punitive and exemplary damages in an amount appropriate to punish Respondent Herbert J. Sims and deter others from engaging in similar wrongful conduct.

**Statement of Claim-10**

## FAILURE TO SUPERVISE AND CONTROL

Respondent Herbert J. Sims has a duty to properly supervise and control its agent Drayer pursuant but not limited to Section 20(a) of the 1934 Securities and Exchange Act, Section 3010 of the NASD Conduct Rules and Rule 342 of the New York Stock Exchange.

Respondent Herbert J. Sims failed to supervise and control Drayer in its capacity as employer and/or "control person", and to make sure that all its registered representatives complied with all laws, rules and regulations and/or had the power to exercise supervision and control over Drayer.

As a result of Respondent Herbert J. Sims breaching its fiduciary duty to supervise and control Drayer, Claimants (excluding James Darden) have suffered damages of approximately $1,000,000.

## NEGLIGENCE & GROSS NEGLIGENCE

Herbert J. Sims, by virtue of its position as a seller of securities, its professional skill and ability, the level of confidence and care imposed upon other broker-dealers in similar positions, and its fiduciary obligations, owed each Claimant due care.  The industry standard of care is set forth by the NASD, the NYSE, the SEC rules, the various State Acts and Administrative Codes, and by the firm's own internal guidelines.

Herbert J. Sims's violation of NASD and NYSE Rules constitutes negligence.  As the Fifth Circuit observed in Miley v. Oppenheimer, Inc., 637 F.2d 318, 333 (5th Cir. 1981), the "NYSE and NASD rules are excellent tools against which to assess in part the

Compass Law Group PLLC
1200 Fifth Avenue
Suite 1900
Seattle, 98101

reasonableness or excessiveness of a broker's handling of an investor's account," and the lower court properly included a reference to these rules in its jury charge. See Mihara v. Dean Witter & Company, Inc., 619 F.2d 814, 824 (9th Cir. 1980) ("Appellants contend that the admission of testimony regarding the New York Stock Exchange and NASD rules served to dignify those rules and regulations to some sort of standard. The admission of testimony relating to those rules was proper precisely because the rules reflect the standard to which all brokers are held.") See also Dean Witter Reynolds, Inc. v. Hammock, 489 So.2d 761, 767 (1986) ("Case law is clear that evidence of violation of industry standards is admissible as non-conclusive evidence of negligence").

Herbert J. Sims's violations of the various State Administrative Codes where claimants reside (most reside in California) constitutes negligence *per se* because these rules were enacted for the protection of investors. Furthermore, a claim of improper supervision is grounded in negligence and is a proper basis for imposing liability upon a brokerage firm. F.D.I.C. v. NASD, Inc., 582 F.Supp. 72, 74 (S.D. Iowa) affd, 747 F.2d 498 (8th Cir. 1984).

As a general rule, a customer who is solicited by a broker dealer is presumed to have contracted with reference to the rules and established customs of the exchanges in which the broker deals. See, 12 Am.Jur. 2d, *Brokers*, §119. These rules provide, *inter alia*, that members of the NYSE and NASD shall observe high standards of honor and equitable principles of trade, shall not recommend securities which are unsuitable to a customer's needs, shall use due diligence to learn the essential facts relative to each such security, and shall maintain an effective program of supervision and control designed to detect mishandling of customers' accounts. In California the Courts have found:

**Statement of Claim-12**

**Compass Law Group** PLLC
1200 Fifth Avenue
Suite 1900
Seattle, 98101

the extent of a stockbroker's fiduciary duty is as clear as it is broad. "`Confidential and fiduciary relations are, in law, synonymous, and may be said to exist whenever trust and confidence is reposed by one person in the integrity and fidelity of another. . . .' [Citations.] . . . `An agent is a fiduciary. His [or her] obligation of diligent and faithful service is the same as that imposed upon a trustee. [Citations.]' [Citations.] `The relationship between broker and principal is fiduciary in nature and imposes on the broker the duty of acting in the highest good faith toward the principal. [Citations.]' [Citations.] With respect to stockbrokers it is recognized, `The duties of the broker, being fiduciary in character, must be exercised with the utmost good faith and integrity.' [Citations.]" (Twomey, supra, 262 Cal.App.2d at pp. 708-709.) Duffy v. Cavalier, 215 Cal.App.3d 1517 (1989) 264 Cal.Rptr.

The duty in a claim for improper supervision is, of course, the duty of the brokerage firm to exercise a reasonable degree of control and supervision over the activities of its brokers and underwriters. In the instant case, Herbert J. Sims had supervisory duties over its Registered Representatives and Underwriters and failed to diligently and properly supervise its officers, employees, and agents.

Drayer and others at Herbert J. Sims were at all times material hereto acting within the scope of his employment with Herbert J. Sims and since a corporation can only act through its employees and other agents, Herbert J. Sims is also liable under principles of *respondeat superior.*

Under the doctrine of *respondeat superior,* the law recognizes the liability of corporations for the wrongful acts of their employees committed while acting in the scope of their employment. See Restatement (Second) of Agency, §219. Under the doctrine of *respondeat superior* there is no "good faith" defense. New York Central Railroad v. White, 243 U.S. 188, 198 (1917). See generally, Paul F. Newton & Co. v.

**Statement of Claim-13**

Texas Commerce Bank, 630 F.2d 1111 (5th Cir. 1980). v55. Brokerage firms, like other

corporations, are liable for the actions of their employees based on *respondeat superior*.

Henricksen v. Henricksen, 640 F.2d 887 (7th Cir.), cert. denied sub nom. Smith Barney.

Harris Upham & Co.. Inc. V. Henricksen, 454 U.S. 1097, 102 S.Ct. 669 (1981); Texas

Commerce Bank, 630 F.2d at 1118. The firm may be held liable "even though the

[employee's] specific conduct was carried on without the knowledge of the [firm]."

Henricksen, 640 F.2d at 887 (quoting Feyv. Walston & Co., Inc., 493 F.2d 1036,1052

n.19 (7th Cir. 1974)). See also Davis v. Merrill Lynch, Pierce, Fenner & Smith. Inc., 906

F.2d 1206,1214 (8th Cir. 1990) (between a principal and a third party, the principal must

bear the burden of an agent who acted improperly).

Herbert J. Sims breached its duty to Claimants by failing to provide sufficient

control and supervision over its officers, employees, agents, and registered

representatives and in not ensuring compliance with the applicable federal and state

securities laws, rules, regulations, policies, self-regulatory organization policies, and

procedures.

Herbert J. Sims's conduct as set forth above proximately caused Claimants (other

than James Darden) to suffer damages of $1,000,000. Consequently, Herbert J. Sims's

actions as set forth above constitute both negligence and gross negligence.

Herbert J. Sims material misstatements and omissions also breeched its duties to

the Claimants' agent James Darden. At the time Mr. Darden purchased this issue for his

clients, he was managing approximately 75 to 90 client's portfolios, and his annual

income was between $175,000 and $200,000. As a result of the misrepresentation of the

material facts to Darden through Scott Drayer, representing Herbert J. Sims, Mr.

**Compass Law Group** PLLC
1200 Fifth Avenue
Suite 1900
Seattle, 98101

Darden's business has been ruined. He now has but twelve client's and manages $1,500,000 in assets. The damage to Mr. Darden's business due to Herbert J. Sims breech of contract is approximately $1,000,000.

## VIOLATION OF FEDERAL & STATE SECURITIES LAWS, NASD CONDUCT RULES AND NYSE RULES

Respondent's wrongful conduct, as alleged above, constitutes violations of federal and state securities law, including but not limited to Sections 10 and 20 of the Securities Exchange Act of 1934 and Rule 1 O(b) 5 promulgated thereunder and Sections 12 (2) and 15 of the Securities Act of 1933, NASD Conduct Rules 2110, 2120, 2520, 2310, IM-2310-2, 3010, and the comparative New York Stock Exchange Rules.

The California Securities Statute § *25401 Corp.* provides that:

> It is unlawful for any person to offer or sell a security in this state or buy or offer to buy a security in this state by means of any written or oral communication which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

Herbert Sims and its agents owed Claimants a duty to fully disclose the risks associated with the purchase of securities and to advise them of all material information that Herbert Sims was privy to. This duty is in accordance with § 10:260.218.2. (Suitability of Recommendations) of the California Corporations Code which states:

> Any broker-dealer and any agent employed by such a broker-dealer who recommends to a customer the purchase, sale or exchange of any security shall have reasonable grounds to believe that the recommendation is not unsuitable for such customer on the basis of information furnished by such customer after reasonable inquiry

**Statement of Claim-15**

**Compass Law Group** PLLC
1200 Fifth Avenue
Suite 1900
Seattle, 98101

concerning the customer's investment objectives, financial
situation and needs, and any other information known by
such broker dealer or agent.

It is important to note that the Claimants do not have to prove that Herbert Sims and its

registered representatives intended to misrepresent or omit material facts, as *California

Corporations Code* § 25401 has no scienter requirement. The law is clear that the seller

of a security is liable if he or she (1) makes any untrue statement of a material fact, or (2)

omits to state a material fact necessary to prevent the statements from being misleading,

regardless of intent.

## FRAUD

Herbert Sim's concealment of the risk that Claimants were subjected to

constitutes fraud.

> It is the settled law of this state, and elsewhere, that
> "'[W]here there exists a relationship of trust and confidence
> it is the duty of one in whom the confidence is reposed to
> make full disclosure of all material facts within his
> knowledge relating to the transaction in question and any
> concealment of material facts is a fraud.'" (Estate of Shay
> (1925) 196 Cal. 355, 365 [237 P. 1079]; Martin v. Martin
> (1952) 110 Cal.App.2d 228, 233 [242 P.2d 688]; Daily v.
> Superior Court (1935) 4 Cal.App.2d 127, 131-132 [40 P.2d
> 936].) "'Where there is [such] a duty to disclose, the
> disclosure must be full and complete, and any material
> concealment or misrepresentation will amount to fraud
> sufficient to entitle the party injured thereby to an action.'"
> (Stafford v. Schultz (1954) 42 Cal.2d 767, 777 [270 P.2d
> 1]; Pashley v. Pacific Elec. Ry. Co. (1944) 25 Cal.2d 226,
> 235 [153 P.2d 325]; and see Stevens v. Marco, supra, 147
> Cal.App.2d 357, 378; Kruse v. Miller (1956) 143
> Cal.App.2d 656, 659-660 [300 P.2d 855, 61 A.L.R.2d
> 1231].) Main v. Merrill Lynch, Inc., 67 Cal.App.3d 19
> (1977). 136 Cal.Rptr. 378

**Statement of Claim-16**

Compass Law Group PLLC
1200 Fifth Avenue
Suite 1900
Seattle, 98101

**ELDER ABUSE**

Many of the claimants in this matter are California residents that are elderly or disabled. Respondents violated California Welfare & Institutions Code, Section 15600 et seq., which provides for the recovery of attorney's fees and costs for an elder, meaning any person residing in the State of California who is sixty-five (65) years of age or older, as well as any person who is disabled, who has been subjected to a fiduciary abuse, "meaning a situation in which any person who stands in a position of trust to an elder takes, secretes or appropriates their money or property, to any use or purpose not in the due and lawful execution of his or her trust." The Claimants are thus entitled to recover their attorney's fees and costs (sec. 15610.27, 15610.30, 15657 and 15657.1).

In engaging in the wrongful conduct alleged in this cause of action, Respondents acted with oppression, fraud and malice, and therefore Claimants are entitled to punitive damages and reasonable attorney's fees and costs pursuant to Welfare and Institutions Code, Section 15657 and 15657.1

Respondent is also liable for treble damages pursuant to California Civil Code Section 3345 which authorizes the imposition of a fine, civil penalty or other remedy in an amount up to three times greater than authorized by law when the party practicing the unfair or deceptive practice has caused one or more senior citizens or persons with disabilities to suffer, *inter alia,* a substantial loss of property set aside for retirement or for personal or family care maintenance or assets essential to the health or welfare of the senior citizen.

**Compass Law Group** PLLC
1200 Fifth Avenue
Suite 1900
Seattle, 98101

As a result of the wrongful conduct engaged in by Respondent Herbert J. Sims, Claimants have suffered damages in excess of $1,000,000.

WHEREFORE, Claimant requests damages and recovery against Herbert J. Sims as follows:

1. General and compensatory damages of approximately $1,000,000 for all claimants other than James Darden III;

2. General and compensatory damages of approximately $1,000,000 for James Darden III;

3. Cost of proceedings;

4. Punitive damages in an amount according to proof;

5. Interest at the legal rate on all sums recovered;

6. Attorney's fees and costs; and

7. Such other and further relief as this panel deem just and appropriate.

DATED this 18th day of April, 2007.

COMPASS LAW GROUP PLLC

_____

Mark Roth CSBA #143510
David Gaba WSBA #18908
Attorneys for Claimants

**Statement of Claim-18**

Compass Law Group PLLC
1200 Fifth Avenue
Suite 1900
Seattle, 98101

<u>**CERTIFICATE OF SERVICE**</u>

I HEREBY CERTIFY that the original and 4 copies of the Statement of Claim, and the Claimants' Uniform Submission Agreement were furnished via overnight courier to Director of Arbitration, NASD Dispute Resolution, One Liberty Plaza, 27th Floor, 165 Broadway, New York, N.Y. 10006, on this __18__ day of April, 2007.


*Bamba C. Craner*
B. C. Craner

**Statement of Claim-19**

**Compass Law Group** PLLC
1200 Fifth Avenue
Suite 1900
Seattle, 98101