THE HONORABLE MARTIN J. JENKINS

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Herbert J. Sims & Co., Inc., <br><br> Plaintiff, <br><br> vs. <br><br> Mark Roven, James Darden III, Rod Butterfield, Steve Bares, Jay Magwire, Carolyn Magwire, Dorothy McCarty, Richard Teerlink, Elenora Crone, Nellie Morison, Scott M. Crone, Scott R. Crone and Nadine Vanderlanes, <br><br> Defendants. | CASE NO.: C07-04777 MJJ <br><br> **MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION** <br><br> Date: January 8, 2008 <br> Time: 9:30 a.m. <br> Dept: 11. 19th Floor |

**1. Introduction**. Defendants are entitled to an order denying plaintiff H. J. Sims & Co., Inc.'s ("HJS") motion for a preliminary injunction prohibiting the Financial Industry Regulatory Authority ("FINRA")(f.k.a. NASD) arbitration between it and defendants from proceeding because 1) under the FINRA rules, a member firm like HJS is required to arbitrate claims between it and its customers arising out of the members business, and 2) the plain meaning and ordinary usage of the term "customer" in the FINRA compulsory arbitration rules clearly includes persons such as defendants who purchase products from HJS through their agents.

2. **Statement of Facts.**

   **A. <u>The Parties</u>.** This proceeding arises out of the sale of certain bonds by HJS to the defendants as more particularly set forth below, and the efforts of the defendants to prosecute arbitration claims to recover their losses on those bonds. Defendant James Darden III ("Darden") is a registered investment advisor doing business as Integrity Financial Management who invests his clients' money according to their financial objectives. Defendants Mark Roven, Rod Butterfield, Steve Bares, Jay Magwire, Carolyn Magwire, Dorothy McCarty, Richard Teerlink, Elenora Crone, Nellie Morison, Scott M. Crone, Scott R. Crone and Nadine Vanderlanes (collectively the "Investors") were all Darden clients whom had bonds purchased by Darden from HJS on their behalf and for their accounts. HJS is an investment banking and brokerage firm whose business activities include underwriting and selling new bond offerings to finance senior living facilities. Non-party Scott Drayer ("Drayer") is the HJS broker who conducted substantial business with Darden over the years and who solicited Darden to have his clients invest in the offering at issue in the underlying arbitration.

   **B. The Siebert Accounts.** As with all of Darden's clients, each of the Investors had accounts in their respective names with discount brokerage Muriel Siebert & Co., Inc. ("Siebert") and each gave Darden a limited power of attorney to use the account to trade securities on its behalf. (Darden Dec. No. 2.) Whenever Darden wished to make a bond trade on behalf of his clients, including the Investors, he would phone in an order to Siebert's trading desk, specifying the issue to be purchased, the clients for whom the purchase was to be made and the amount of bonds to purchase for each such client. (*Id*.) Siebert would then execute those orders on behalf of the client. (*Id*.) Upon the execution of a trade, Siebert's clearing firm would send trade confirmations to client, with a copy to Darden. (*Id*.) Over the years, Darden learned that because HJS bonds are generally not rated, Siebert did not maintain an inventory of HJS bonds and that it had to fill all of his HJS orders directly from from HJS. (*Id*.)

   **C. The Transactions.** Darden had known HJS broker Scott Drayer (Drayer") since the early to

1  mid 1990's when Drayer "cold called" him to solicit purchases on behalf of Darden's clients in a
2  particular bond issue to finance an extension of a retirement facility in Vermont. (Darden Dec. No. 3.)
3  Darden did in fact purchase some of the Vermont bonds on behalf of his clients, which turned out fairly
4  successful, and thus began Darden's long commercial relationship with Drayer and HJS. (*Id*.) During
5  the course of that relationship, Darden would get calls from Drayer suggesting offerings for Darden's
6  clients on a fairly regular basis, and on occasion, Darden would call Drayer for the same reason. (*Id*.)
7  All told, Darden's clients participated in approximately 40 or so HJS bond offerings over the years.
8  (*Id*.)
9       In March 2002, Drayer phoned Darden and informed him that he had been given authority to sell
10 a limited quantity of a bond issue floated to finance the construction of a retirement facility in Georgia
11 known as Regency Pointe. (Darden Dec. No. 4.) Drayer suggested that Darden consider purchasing
12 some of these bonds for his clients, explaining that the offering had been nearly 100% pre-sold and and
13 that this bond lot had just been made available. (*Id*.) Drayer explained certain attributes of the bonds
14 which he claimed afforded the bondholders enhanced security and stated that Darden should act fast for
15 his clients because the available bonds surely would not last long. (*Id*.) Darden requested prospectuses
16 for delivery to the clients and ultimately agreed to purchase some of the bonds for his customers. (*Id*.)
17       Thereafter, Darden employed his standard procedure for making a bond trade on behalf of his
18 clients.  (Darden Dec. No. 5.) He called the Siebert trading desk, informed the Siebert representative
19 that he wished to purchase approximately $500,000 of the Regency Pointe bonds being offered by HJS,
20 identified the clients on whose behalf the purchases were to be made along with a specification of the
21 ///
22 ///
23 ///
24

**MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION (C07-04777 MJJ) – Page 3**

**COMPASS LAW GROUP**
1200 Fifth Avenue, Suite 1900
Seattle, WA 98101
(206) 467-7026

1 amount of bonds being purchased by each client.[1] (*Id*.) To confirm the purchase request, Darden faxed Siebert a list of clients who were purchasing the bonds and the amount of each respective purchase. (*Id*.) Siebert then purchased the bonds from HJS on the Investors' behalf and for their accounts, and later sent confirmations to the Investors and Darden. (*Id*.) Based on Darden's conversations with Drayer, HJS knew well that the bonds were being purchased for Darden's clients.

**3. Legal Discussion.**

**A. HJS's Request for a Preliminary Injunction Should Fail Because The Investors Were HJS Customers.**

HJS correctly asserts that this dispute is governed by FINRA Rule 12200(2), which provides that a member firm such as HJS must submit to arbitration of disputes which a) are between a customer and a member firm, and b) the dispute arises out of the member firm's business activities. HJS does not dispute that this particular claim arises out of its business activities and bases its sole objection to arbitration on the argument that the Investors were not its customers. As set forth below, this argument ignores long standing principles of agency law, defies the express language of Rule 12200 and therefore must be denied.

As a preliminary matter, this case is governed not only by Rule 12200 but also by the Federal Arbitration Act ("FAA") in that diversity provides an independent basis for jurisdiction, the dispute involves an agreement to arbitrate (i.e. HJS's agreement to arbitrate all customer claims) and the agreement to arbitrate affects interstate commerce. 9 U.S.C. § 1, et seq. As the United States Supreme Court recently reiterated in *Howsam v. Dean Witter Reynolds, Inc*., 537 U.S. 79, 83, 123 S.Ct 588 (2002), the FAA expresses a strong federal policy favoring arbitration. In light of this policy, "any doubts as to scope of arbitrable issues should be resolved in favor of arbitration." *Moses H. Cone Mem'l*

---

[1] Darden later caused additional Regency Pointe bonds to be purchased from HJS, for an approximate total of $995,000 of Regency Pointe bonds being purchased by the Investors through their agent Darden. (Darden Decl. No. 5.)

| | |
|---|---|
| **MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION (C07-04777 MJJ) – Page 4** | **COMPASS LAW GROUP**<br>1200 Fifth Avenue, Suite 1900<br>Seattle, WA 98101<br>(206) 467-7026 |

*Hosp. v. Mercury Constr. Corp*. 460 U.S. 1, 24-25, 103 S.Ct. 927 (1983). As the court explained in *Gilmore v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 26, 111 S.Ct. 1647 (1991), "questions of arbitrability must be addressed with a healthy regard for the federal policy favoring arbitration." In *AT&T Technologies v. Communications Workers*, 475 U.S. 643, 650 (1986), the Court described the deference to be afforded in favor of arbitration as follows:

> [A]n order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage.

Other courts faced with issues concerning who is a "customer" within the meaning of FINRA/NASD arbitration requirements rely heavily on this federal policy. In *John Hancock Life Ins. Co. v. Wilson*, 254 F.3d 48, 53 (2nd Cir. 2001) the court noted that the NASD Code 'defines the term 'customer' broadly, excluding only a broker or dealer.'" In *Bensadoun v. Jobe-Riat,* 316 F.3d 171, 175 (2nd Cir. 2003), the court held that if there is any ambiguity regarding the meaning of customer as used in the NASD rules, "the term should be construed in favor of arbitration." This is the background upon which this case must be analyzed.

**B. Roven and Siebert Were Agents of The Investor Defendants.**

HJS apparently claims that even though the Investor Defendants bought these bonds upon HJS's solicitation, they were not HJS "customers" simply because the Investor Defendants purchased the bonds through Darden and Siebert. This claim is flawed.

It is beyond dispute that Darden, in acting pursuant to the limited powers of attorney granted by the Investors, was acting as the agent of the Investors. HSJ was further fully aware of Darden's representative capacity when it solicited Darden to purchase the Regency Pointe bonds. It is equally true that Siebert, as the brokerage firm where the Investors held their accounts, was also acting as the Investors agents. *Chopp Computer Corp. v. U.S.*, 5 F.3d 1344, 1351 (9th Cir. 1993)(". . . a broker is

///

**MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION (C07-04777 MJJ) – Page 5**

**COMPASS LAW GROUP**
1200 Fifth Avenue, Suite 1900
Seattle, WA 98101
(206) 467-7026

ordinarily its client's agent", citing *Black v. Shearson, Hammil & Co.*, 266 Cal.App. 362, 367, 72 Cal.Rptr. 157 (1968).)

As provided in Civil Code Section 2330:

> An agent represents his principal for all purposes within the scope of his actual or ostensible authority, and *all the rights and liabilities which would accrue to the agent from transactions within such limit, if they had been entered into on his own account, accrue to the principal.*

(*Emphasis added*.)(See also, American Builder's Assn. v. Au-Yang, 226 Cal.App.3d 170, 176 276 Cal.Rptr. 262 (1990) (Under California agency law, "an undisclosed principal may prosecute an arbitration in his or her own name.")

For the purpose of the Investor's exercising their rights to demand arbitration under Rule 12200, it is completely irrelevant whether the bonds were ordered and/or purchased by Darden, Siebert or some other agent on the Investors' behalf. In dealing with Siebert and Darden, HJS was in fact dealing with the Investors.

**C. The Investors Were HJS Customers Within the Plain and Ordinary Meaning of Rule 12200.**

Rule 12200 essentially constitutes a contract between FINRA and its member firms which claimants like the Investors can enforce as third party beneficiaries. In interpreting such contracts,

> Contract terms are to be given their ordinary meaning, and when the terms of a contract are clear, the intent of the parties must be ascertained from the contract itself. Whenever possible, the plain language of the contract should be considered first.

*Flores v. American Seafoods Co.*, 335 F.3d 904, 910 (9th Cir. 2003).

The Mirriam-Webster Online Dictionary defines the term customer as "one that purchases a commodity or service." (Hinton Dec. No. 2; Exh 1.) As purchasers of bonds from HJS through their agents, the Investors were purchasing a commodity from HJS. Under the plain, ordinary language of Rule 12200, the Investors are HJS customers asserting claims that arise out of HJS's business. As such, HJS is required to submit to arbitration. This motion should be denied.

**D. HJS's Reliance on the *Brookstreet* Case Is Misplaced.**

HJS places great value on *Brookstreet Securities Corporation v. Bristol Air, Inc.*, 202 U.S. Dist. LEXIS 16784 (N.D.Cal. 2002) for the proposition that clients of an investment advisor which dealt with a brokerage allegedly on behalf of the clients is insufficient to create a customer relationship between the clients and the brokerage for the purposes compulsory arbitration under the NASD rules. HJS reads far too much into *Brookstreet*.

In *Brookstreet*, several of investors filed an arbitration proceeding against a brokerage firm and several of its employees arising out of claims that the investors were defrauded by investment advisor Stroupe and his company PHL. Specifically, the investors alleged that Stroupe and PHL maintained accounts with Brookstreet and convinced the claimants to place their money into the advisor's account for investment in Treasury bonds. The investors claimed that Stroupe then misappropriated the money and used it for his own benefit and to the benefit of his friends and that Brookstreet violated some duty to investigate the advisor (who was not a Brookstreet registered representative) to insure his honesty and trustworthiness. Only a portion of the investors alleged fraudulent statements actually made to them by a Brookstreet employee and there was no allegation that any of the investors had been solicited by Brookstreet or purchased products or services from Brookstreet. The court held that the bare fact that a small group of the investors were "merely doing business with an account holder of a member firm" did not create a sufficient relationship to establish a "customer" relationship under the NASD rules. In fact, as to the investors to whom Brookstreet allegedly made false representations, the Court assumed that they were "customers" and denied the injunction as to them. See *Brookstreet*, fn. 3.

Here, unlike Brookstreet, HJS' registered representative Drayer actively solicited Darden with the express intent to sell bonds to Darden's clients as he had done many times before. Further, unlike the enjoined investors in *Brookstreet*, the registered representatives made fraudulent misstatements and omissions to the Investors agents which lead to the Investors damage. Most significantly of course is

1 the fact that here the Investors were actually solicited by the member firm and in fact bought products
2 from it, as opposed to merely having a relationship with a person doing business with the member. The
3 *Brookstreet* case has no application on the facts presented by this current dispute.

4 **4. Conclusion**.

5 Based on the foregoing, the defendants request that this motion be denied.

7 Respectfully submitted on this 28th day of November, 2007

8         COMPASS LAW GROUP

10 By:/s/ Patrick L. Hinton
    Patrick L. Hinton (CBN 143615)
11     Attorneys for defendants

**MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION (C07-04777 MJJ) – Page 8**

**COMPASS LAW GROUP**
1200 Fifth Avenue, Suite 1900
Seattle, WA 98101
(206) 467-7026

**Certificate of Mailing**

I, Patrick L. Hinton, hereby certify that on this date I caused true and correct copies of the document to which this certificate is attached to be served on the following parties via the Court's ECF system and by placing photocopies of the documents in an envelope, addressed as indicated below with first class postage prepaid, depositing such envelope for delivery with the U.S. Postal Service:

Steven N. Machtinger, Esq.
John D. Pernick, Esq.
Geoffrey S. Beckham, Esq.
Bingham McCutchen, LLP
3 Embarcadero Center
San Francisco, California 94111-4067

Dated: November 28, 2007

/s/ Patrick L. Hinton
Patrick L. Hinton