THE HONORABLE MARTIN J. JENKINS

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Herbert J. Sims & Co., Inc., | CASE NO.: C07-04777 MJJ |
| Plaintiff, | |
| vs. | **DECLARATION OF JAMES DARDEN III IN SUPPORT OF OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION** |
| Mark Roven, James Darden III, Rod Butterfield, Steve Bares, Jay Magwire, Carolyn Magwire, Dorothy McCarty, Richard Teerlink, Elenora Crone, Nellie Morison, Scott M. Crone, Scott R. Crone and Nadine Vanderlanes, | Date: January 8, 2008<br>Time: 9:30 a.m.<br>Dept: 11. 19th Floor |
| Defendants. | |

I, James Darden III, declare:

1. I am a defendants in the above-referenced lawsuit and was at all relevant times the registered investment advisor for defendants Mark Roven, Rod Butterfield, Steve Bares, Jay Magwire, Carolyn Magwire, Dorothy McCarty, Richard Teerlink, Elenora Crone, Nellie Morison, Scott M. Crone, Scott R. Crone and Nadine Vanderlanes (collectively the "Investors"). The facts set forth below are of my own personal knowledge and I could competently testify to them if called as a witness.

**DECLARATION OF JAMES DARDEN III IN SUPPORT OF OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION –
Page 1**                    Page 1

**COMPASS LAW GROUP**
1200 Fifth Avenue, Suite 1900
Seattle, WA 98101
(206) 467-7026

2. All of my clients, including each of the Investors, had accounts in their respective names with discount brokerage Muriel Siebert & Co., Inc. ("Siebert") and each gave me a limited power of attorney to use the account to trade securities on its behalf. Whenever I wished to make a bond trade on behalf of my clients, including the Investors, I would phone in an order to Siebert's trading desk, specifying the issue to be purchased, the client(s) for whom the purchase was to be made and the amount of bonds to purchase for each such client. I would then follow that call with a fax to Siebert, setting forth the same information as relayed in the phone order, and Siebert would then execute those orders on behalf of the client. Upon the execution of a trade, Siebert's clearing firm would send trade confirmations to client, with a copy to me. Over the years, I learned that because HJS bonds are generally not rated, Siebert did not maintain an inventory of HJS bonds and that it had to fill all of his HJS orders directly from from HJS.

3. I first met HJS broker Scott Drayer (Drayer") in the early to mid 1990's when Drayer "cold called" me to solicit me to purchase HJS bonds, the proceeds of which were going to be used to finance an extension of a retirement facility in Vermont, on behalf of my clients. Ultimately, I did in fact cause some of the Vermont bonds to be purchased on behalf of my clients, which investment turned out fairly successful. Thus began my long commercial relationship with Drayer and HJS. During the course of that relationship, I got calls from Drayer on a fairly regular basis suggesting offerings for my clients, and on occasion, I would call Drayer for the same reason. All told, Darden's clients participated in approximately 40 or so HJS bond offerings over the years.

4. In March 2002, Drayer phoned me with news that he had been given authority to sell a limited quantity of a bond issue floated to finance the construction of a retirement facility in Alabama known as Regency Pointe. Drayer suggested that I consider purchasing some of these bonds for my clients, explaining that the offering had been nearly 100% pre-sold and at the bonds being offered had just been made available. Drayer explained certain attributes of the bonds which he claimed afforded

**DECLARATION OF JAMES DARDEN III IN SUPPORT OF OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION –
Page 2**                              Page 2

**COMPASS LAW GROUP**
1200 Fifth Avenue, Suite 1900
Seattle, WA 98101
(206) 467-7026

1 the bondholders enhanced security and stated that I should act fast because the available bonds surely
2 would not last long.  Darden requested prospectuses for delivery to the clients and ultimately agreed to
3 purchase some of the bonds for his customers.

4     5. Thereafter, I employed my standard procedure for making a bond trade on behalf of my
5 clients.  I called the Siebert trading desk, informed the Siebert representative that I wished to purchase
6 approximately $500,000 of the Regency Pointe bonds being offered by HJS, identified the clients on
7 whose behalf the purchases were to be made along with a specification of the amount of bonds to be
8 purchased by each client.   To confirm the purchase request, I faxed Siebert a list of each of the clients
9 who was purchasing the bonds and the amount of each respective purchase.  Siebert then purchased the
10 bonds from HJS on the Investors' behalf and for their accounts, and later sent confirmations to the
11 Investors and me. I later caused additional Regency Pointe bonds to be purchased from HJS, for an
12 approximate total of $995,000 of Regency Pointe bonds being purchased by the Investors through my
13 office.

14     I declare subject to penalty of perjury under the laws of the United States of America that the
15 foregoing is true and correct.

16

17 Dated: November 28, 2007                /s/ James Darden III
                                                                             James Darden III
18
19
20
21
22
23
24

1. the bondholders enhanced security and stated that I should act fast because the available bonds surely would not last long. Darden requested prospectuses for delivery to the clients and ultimately agreed to purchase some of the bonds for his customers.

5. Thereafter, I employed my standard procedure for making a bond trade on behalf of my clients. I called the Siebert trading desk, informed the Siebert representative that I wished to purchase approximately $500,000 of the Regency Pointe bonds being offered by HJS, identified the clients on whose behalf the purchases were to be made along with a specification of the amount of bonds to be purchased by each client. To confirm the purchase request, I faxed Siebert a list of each of the clients who was purchasing the bonds and the amount of each respective purchase. Siebert then purchased the bonds from HJS on the Investors' behalf and for their accounts, and later sent confirmations to the Investors and me. I later caused additional Regency Pointe bonds to be purchased from HJS, for an approximate total of $995,000 of Regency Pointe bonds being purchased by the Investors through my office.

I declare subject to penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: November 28, 2007

_____
James Darden III

**DECLARATION OF JAMES DARDEN III IN SUPPORT OF OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION – Page 3**

Page 3

COMPASS LAW GROUP
1200 Fifth Avenue, Suite 1900
Seattle, WA 98101
(206) 467-7026

**Certificate of Mailing**

I, Patrick L. Hinton, hereby certify that on this date I caused true and correct copies of the document to which this certificate is attached to be served on the following parties via the Court's ECF system and by placing photocopies of the documents in an envelope, addressed as indicated below with first class postage prepaid, depositing such envelope for delivery with the U.S. Postal Service:

Steven N. Machtinger, Esq.
John D. Pernick, Esq.
Geoffrey S. Beckham, Esq.
Bingham McCutchen, LLP
3 Embarcadero Center
San Francisco, California 94111-4067

Dated: November 28, 2007


/s/ Patrick L. Hinton
Patrick L. Hinton

**DECLARATION OF JAMES DARDEN III IN SUPPORT OF OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION –
Page 4**

Page 4

**COMPASS LAW GROUP**
1200 Fifth Avenue, Suite 1900
Seattle, WA 98101
(206) 467-7026