Bingham McCutchen LLP
STEVEN N. MACHTINGER (SBN 61973)
JOHN D. PERNICK (SBN 155468)
GEOFFREY S. BECKHAM (SBN 224126)
Three Embarcadero Center
San Francisco, CA  94111-4067
Telephone:  415.393.2000
Facsimile:  415.393.2286

Attorneys for Plaintiff
Herbert J. Sims & Co., Inc.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| HERBERT J. SIMS & CO., INC.,<br><br>    Plaintiff,<br>v.<br><br>MARK ROVEN, JAMES DARDEN III, ROD BUTTERFIELD, STEVE BARES, JAY MAGWIRE, CAROLYN MAGWIRE, DOROTHY MCCARTY, RICHARD TEERLINK, ELENORA CRONE, NELLIE MORISON, SCOTT M. CRONE, SCOTT R. CRONE, AND NADINE VANDERLANES,<br><br>    Defendants. | No. C07-04777 MJJ<br><br>**PLAINTIFF'S REPLY IN SUPPORT OF ITS MOTION FOR PRELIMINARY INJUNCTION**<br><br>Date:    January 8, 2008<br>Time:    9:30 a.m.<br>Dept:    11, 19th Floor<br>Before:  Judge Jenkins |

I.  **INTRODUCTION**

Relying on a misstatement of the facts and a misreading of the case law, the Defendants, James W. Darden III ("Darden") and his clients (the "Investors"), argue that this Court should find they were customers of Herbert J. Sims & Co., Inc. ("Sims") even though they admit that they were customers of Muriel Siebert & Co. ("Siebert").  Their arguments defy common sense.  There is no actual or implied arbitration agreement between Sims and the Defendants, and no legal or factual basis for forcing Sims to arbitrate this dispute in a forum designed for disputes between brokerages **and their own customers**.  If Darden and the Investors wish to assert claims against Sims with regard to the investments they made in their

A/72334811.3/3005090-0000326991

Siebert accounts, they can pursue those claims in court.

II. **ARGUMENT**

    A. **The Investors Were Customers Of Siebert, Not Sims.**

Defendants define "customer" as "one who purchases a commodity or service." Sims does not disagree with this definition. Obviously, the Investors were customers, but *of whom*? Defendants' own definition defeats their argument. The Investors bought the bonds from Siebert, not from Sims. Therefore, they were Siebert's customers, not Sims'.

Defendants' agency argument does not change that basic fact, and it fails for at least two additional reasons. First, it is based on facts that have not been alleged. The only person alleged in the Statement of Claim to have been the Investors' agent is Darden and Defendants present no evidence that Siebert was acting as the Investors' broker when it purchased the bonds from Sims, rather than as a dealer for its own account. Second, even if Siebert were acting as the Investors' agent, that would still not transform the Investors into customers of Sims. Although Defendants argue that all the rights of an agent accrue to an undisclosed principal, they do not discuss what rights Siebert actually has. Instead, Defendants ask the Court to assume that Siebert had the same rights in its transaction with Sims as the Investors would have had if they had bought the bonds from Sims directly. That is not so. If the Investors had bought the bonds from Sims, they would have been customers of Sims under FINRA's definition and would have the right to arbitration as customers. However, FINRA's definition of customer expressly excludes brokers like Siebert. "The term 'customer' shall not include a broker or dealer." FINRA Rule 120(g). Therefore, Siebert could not be a customer of Sims and, consequently, could not pass any customer arbitration rights (or any other customer rights) to the Investors even if it had been acting as their agent.

    B. **The Case Law Does Not Support Claimants' Demand For Arbitration**

Defendants cite cases for the general proposition that federal policy favors arbitration. However, the federal policy favoring arbitration applies only to determining the scope of an arbitration agreement; it does not apply to the question of whether an arbitration

A/72334811.3/3005090-0000326991               2

agreement exists. *See BMA Financial Services, Inc. v. Guin*, 164 F. Supp. 2d 813, 818 (W.D. La. 2001). Accordingly, in a context similar to this one, this Court held that "until this court determines that the Defendant-Investors were 'customers' and are therefore entitled to invoke arbitration pursuant to the [NASD arbitration] Rule, this court may not give Defendant-Investors the benefit of the federal policy favoring arbitration." *Brookstreet Securities Corporation, et al., v. Bristol Air, Inc., et al.*, 2002 U.S. Dist. LEXIS 16784, * 22 (N.D. Cal. Aug. 2002), quoting *BMA Financial Services,* 164 F. Supp. 2d at 818.

Indeed, Defendants admit that arbitration can be compelled only if the Court finds that the parties intended to be bound by an agreement to arbitrate. *See* Opposition brief at 4. In this case, there is no arbitration agreement, express or implied, between Sims and the Defendants. Instead, Defendants rely solely on the FINRA rule that requires a member firm to arbitrate disputes with its customers. But, as Defendants' own cases show, courts have found the requisite intent in the absence of an express customer arbitration agreement only when the claimant is able to demonstrate that the member firm or its agent engaged in some kind of activity that could have led the investor to believe that he or she had a customer relationship with the firm.

Thus, in *Bensadoun v. Jobe-Riat*, 316 F.3d 171 (2d Cir. 2003), the Second Circuit Court of Appeals made it clear that the "selling away" decisions such as *John Hancock Life Ins. Co. v. Wilson*, 254 F.3d 48 (2d Cir. 2001) and *Oppenheimer & Co., Inc. v. Neidhardt*, 56 F.3d 352 (2d Cir. 1995) compelled arbitration because an agent of the member firm had led the investors to believe that their funds would be placed under the member firm's control. *Bensadoun* quoted with approval the crux of the *Oppenheimer* opinion: "Having turned over their funds to Oppenheimer's representative so as to become customers of Oppenheimer, the Claimants did not lose the legal benefits of customer status because Oppenheimer's representative fraudulently established their account in a manner designed to conceal and defeat their interest." *Bensadoun*, 316 F. 3d at 176-177. The Second Circuit applied the same reasoning in analyzing whether investors could compel arbitration against a brokerage firm, Paine Webber, based on the activities of its agent, Bensadoun: "If Bensadoun was complicit in a fraudulent

scheme that involved misleading Investors into believing that they were customers of his and Paine Webber's, then the Investors were his customers for the purposes of the NASD code, and Bensadoun must arbitrate. On the other hand, if the Investors intended to place their funds in the CFM accounts and intended that [their investment advisor] Autard would exercise sole control over those accounts, then they were not Bensadoun's customers under NASD rules." *Id.* at 177.

Consistent with that reasoning, this Court refused to compel Brookstreet to arbitrate claims by investors who interacted only with their investment advisor, even though the advisor had placed their funds into a Brookstreet account without their authorization. There was no basis for requiring Brookstreet to arbitrate because there was no action taken by Brookstreet, or anyone else, that led those investors to believe that they were customers of Brookstreet.

In this case, Darden and the Investors have not alleged that Sims or its agent, Drayer, did anything to suggest to them that they had a broker-customer relationship with Sims. Indeed, there is no evidence that any of the Investors knew that the bonds they purchased from Siebert came from Sims. The Investors bought the bonds from Siebert and received confirmations of those purchases from Siebert. The Investors had no contact of any kind with Sims and there is no allegation or evidence that any of the Investors believed, or had any reason to believe, that they were Sims' customers. Nor could Darden have reasonably believed that his clients were customers of Sims rather than Siebert. Darden was an experienced investment advisor and was not misled: He knew that his clients were customers of Siebert and that Sims was acting in its capacity as a bond dealer in supplying Siebert with bonds to sell to Darden's clients in their Siebert account. Darden and the Investors knew that Siebert, not Sims, was their broker. Therefore, as in *Brookstreet,* there is no basis for requiring Sims to arbitrate these claims.

None of Defendants' cases support the proposition that an investor who knew that he was the customer of one firm can maintain that he was the customer of another firm for purposes of compelling arbitration under FINRA's rules. In such a situation, the contractual requirement for compelling arbitration based on the intent of the purported parties to the imputed arbitration agreement does not exist. This result also protects against unfairness because the

abbreviated procedures and protections afforded by arbitration are inappropriate for disputes between parties who have not mutually consented to that process in the course of a customer-broker relationship.  Indeed, courts have repeatedly cautioned against an overinclusive definition of "customer."  *See Bensadoun,* 316 F.3d at 177 (cautioning that if an overbroad definition were adopted "every purchaser of shares in a mutual fund and every beneficiary of a pension fund would arguably be 'customers' of every institution with which those funds did business, and would be entitled to demand arbitration under the NASD"); and *BMA Financial Services*, 164 F. Supp. 2d at 819 (cautioning that, if defendant's dictionary definition of customer were accepted, then, simply by becoming a NASD member, a firm would be agreeing to arbitrate the claims of any person who purchased an investment, not just the claims of its customers).  The term "customer" must be interpreted to reflect "market realities" and the "reasonable expectations of [FINRA] members."  *BMA Financial Services*, 164 F. Supp. 2d at 818-819.  The market realities and the reasonable expectations of the parties in this case are that the Investors were customers of Siebert, not Sims.

III.    **CONCLUSION**

      Forcing Sims to arbitrate this dispute would be unfair because the parties never agreed to arbitration.  On the other hand, enjoining the arbitration does not deprive Defendants of a remedy.   If they wish to assert that they were defrauded by Sims in connection with their bond investments, they may assert those claims in court.  The Court should declare that Darden and the Investors are not customers of Sims, and Sims' motion for a preliminary injunction should be granted.

DATED:  December 4, 2007

                                            Bingham McCutchen LLP

                                      By: _____/s/_____
                                                 Steven N. Machtinger
                                                 Attorneys for Plaintiff
                                                Herbert J. Sims & Co., Inc.