United States District Court
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| HERBERT J. SIMS & CO.,INC., | No. C07-04777 MJJ |
| Plaintiff, | **ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION** |
| v. | |
| MARK ROVEN, | |
| Defendant. | |

### INTRODUCTION

Before the Court is Plaintiff Herbert J. Sims & Co., Inc.'s ("Plaintiff") Motion for Preliminary Injunction. (Docket No. 7.) Defendants James Darden III ("Darden"), Marc Roven, Rod Butterfield, Steve Bares, Jay Maguire, Carolyn Maguire, Dorothy McCarthy, Richard Teerlink, Elenora Crone, Nellie Morison, Scott M. Crone, Scott R. Crone and Nadine Vanderlanes (collectively, "Defendants") oppose the Motion. For the following reasons, the Court **GRANTS** the Motion.

### FACTUAL BACKGROUND

Defendant Darden is a registered investment advisor doing business as Integrity Financial Management who invests his clients' money according to their financial objectives. (Opp. at 2; Darden Decl. ¶ 1.) The remaining twelve Defendants (collectively, the "Investors") were clients of Darden. (Darden Decl. ¶ 1.) Each of the Investors had accounts in their respective names with discount brokerage Muriel Siebert & Co., Inc. ("Siebert") and each gave Darden a limited power of

1    attorney to use the account to trade securities on its behalf.  (Darden Decl. ¶ 2.)  Whenever Darden
2    wished to make a bond trade on behalf of his clients, including the Investors, he would phone in an
3    order to Siebert's trading desk, specify the issue to be purchased, the clients for whom the purchase
4    was to be made and the amount of bonds to purchase for each client.  (*Id*.)  Upon the execution of a
5    trade, Siebert's clearing firm would send trade confirmations to the clients, with a copy to Darden.
6    (*Id*.)

7    Plaintiff is an investment banking and brokerage firm whose business activities include
8    underwriting and selling new bond offerings to finance senior living facilities.  (Opp. at 2.)  Plaintiff
9    is a registered broker-dealer and a member of the Financial Industry Regulatory Authority (FINRA).
10   (Mem. of P. & A. at 3.)  Scott Drayer ("Drayer") is a broker working for Plaintiff.  (*Id*. ¶ 3)  Drayer
11   and Darden communicated over the years regarding Plaintiff's bond offerings.  (*Id*.)  Darden's
12   clients participated in approximately 40 of Plaintiff's bond offerings over the years.  (*Id*.)  Siebert
13   did not maintain an inventory of Plaintiff's bonds and it had to fill orders for these bonds directly
14   from Plaintiff.  (Darden Decl. ¶ 2.)

15   In March 2002, Drayer contacted Darden regarding a limited quantity of a bond issue floated
16   to finance the construction of Regency Pointe, a retirement facility in Alabama.  (*Id*. ¶ 4.)  Drayer
17   explained certain attributes of the bonds which he claimed afforded the bondholders enhanced
18   security and urged Darden to purchase the bonds.  (*Id*.)  Thereafter, Darden, on multiple occasions,
19   employed his standard procedure to purchase the Regency Pointe bonds for his clients: he called the
20   Siebert trading desk and requested the purchase, Siebert purchased the bonds and sent confirmations
21   to Darden and the Investors.  (*Id* ¶ 5.)   In total, Darden facilitated the purchase of $995,000 of
22   Regency Pointe bonds for the Investors in this action. (*Id*.)

23   On April 18, 2007, Darden and the Investors filed a claim to initiate an arbitration
24   proceeding against Plaintiff before the National Association of Securities Dealers Dispute
25   Resolution (NASD-DR).[1]  (Machtinger Decl., Exh. A.)  The Statement of Claim alleges that the
26   Regency Pointe bonds that Darden caused to be purchased on behalf of the Investors were unsuitable

---

[1] In July 2007, the National Association of Securities Dealers ("NASD") became known as FINRA and the NASD-DR became known as FINRA-DR.

2

investments for the Investors and that the Investors suffered damages as a result. (*Id*. at 2-7.) Specifically, Darden and the Investors allege that Plaintiff's employee Drayer misrepresented, deceived and/or concealed material facts known to him, made unsuitable investment recommendations and thus breached his fiduciary, contractual and other duties to the Investors. (*Id*. at 8-9.) The Investors also seek recovery for constructive fraud, failure to supervise and control, negligence and gross negligence, and violations of federal and state securities laws, NASD Conduct Rules, New York Stock Exchange Rules and the California Elder Abuse statute, Welfare and Institutions Code Section 15600 *et seq*. (*Id*. at 10-18.) The Investors seek to recover $1 million they allegedly lost as a result of these investments. (*Id*. at 9.) Darden alleges that as a result of his clients' losses, his investment advisory business was ruined, causing him to lose $1 million, which he seeks to recover from Plaintiff as damages. (*Id*. at 9-10.)

On September 17, 2007, Plaintiff's counsel notified FINRA-DR that Plaintiff declined to submit to arbitration because Plaintiff had not entered into any arbitration agreements with any of the claimants and because none of the claimants are, or have been, its customers. (Machtinger Decl., Exh. B.) On the same day, Plaintiff filed this action, seeking Declaratory and Injunctive relief. (*See* Complaint, Docket No. 1.) Plaintiff seeks a declaration that Darden and the Investors are not its customers and an order enjoining them from pursuing their claims in arbitration. (Complaint at 5-6.) Plaintiff now seeks a preliminary injunction to stay the arbitration proceeding pending a trial of the action in this Court.

## **LEGAL STANDARD**

Federal Rule of Civil Procedure 65 permits the issuance of a preliminary injunction to preserve the positions of the parties until a full trial can be conducted. *LGS Architects, Inc. v. Concordia Homes*, 434 F.3d 1150, 1158 (9th Cir. 2006) (citing *University of Texas v. Camenisch*, 451 U.S. 390, 395 (1981)). In all cases, the burden of persuasion remains with the party seeking preliminary injunction relief. Hon. William R. Schwarzer, et al., *Federal Civil Procedure Before Trial* § 13:159 (2006) (citing *West Point–Pepperell, Inc. v. Donovan*, 689 F.2d 950, 956 (11th Cir. 1982)). When a party is seeking a preliminary injunction, he or she must make a "clear showing" of either: "(1) a combination of probable success on the merits and the possibility of irreparable injury,

3

or (2) that serious questions are raised and the balance of hardships tips sharply in favor of the moving party. These standards 'are not separate tests but the outer reaches of a single continuum.'" *Stuhlbarg Int'l Sales Co. v. John D. Brush & Co., Inc*., 240 F.3d 832, 839-40 (9th Cir. 2001) (citation omitted); *City of Angoon v. Marsh*, 749 F.2d 1413, 1415 (9th Cir. 1984). "These two formulations represent two points on a sliding scale in which the required degree of irreparable harm increases as the probability of success decreases." *Roe v. Anderson*, 134 F.3d 1400, 1402 (9th Cir.1998) (citation omitted). Consequently, "the less certain the district court is of the likelihood of success on the merits, the more plaintiffs must convince the district court that the public interest and balance of hardships tip in their favor ." *Southwest Voter Registration Educ. Project v. Shelley*, 344 F.3d 914, 918 (9th Cir. 2003) (en banc) (per curiam) (citation omitted); *see also Miller v. California Pac. Med. Ctr*., 19 F.3d 449, 456 (9th Cir. 1994) (en banc) (citations omitted).

## ANALYSIS

Plaintiff is entitled to a preliminary injunction to stay the arbitration proceeding if the Court finds that Plaintiff has made a clear showing of probable success on the merits and the possibility of irreparable injury. The Court turns first to Plaintiff's probable success of enjoining Defendants from proceeding with arbitration.

Arbitrability is "[the] question [of] whether the parties have submitted a particular dispute to arbitration." *Howsam v. Dean Witter Reynolds, Inc*., 537 U.S. 79, 83 (2002). It is "an issue for judicial determination [u]nless the parties clearly and unmistakably provide otherwise." *Id.* (quoting *AT&T Techs., Inc. v. Communications Workers of Am.*, 475 U.S. 643, 649 (1986)). The Court, however, can only determine whether an agreement to arbitrate exists "and if it does, enforce it in accordance with its terms." *Simula, Inc. v. Autoliv, Inc.*, 175 F.3d 716, 719 (9th 1999). This is consistent with federal policy that favors arbitration. *Volt Sciences, Inc. v. Bd. of Trustees of Leland Stanford Junior Univ*., 489 U.S.468, 475 (1989).

FINRA arbitrations are governed by the NASD Code of Arbitration Procedure (the "Code"). Rule 12200 of the Code states:

> Parties must arbitrate a dispute under the Code if:
> · Arbitration under the Code is either:
>    (1) Required by a written agreement; or
>    (2) Requested by the customer.

4

- The dispute is between a customer and a member or associated person of a member; and
- The dispute arises in connection with the business activities of the member or the associated person, except the insurance business activities of a member that is also an insurance company.

NASD Code Arb. Proc. 12200.  Therefore, under the Code, customers can compel registered members of FINRA to arbitrate certain disputes even when no written arbitration agreement exists. *See* NASD Code Arb. Proc. 12200; *see, e.g.*, *Goldman Sachs & Co. v. Becker*, No. 07-1599, 2007 WL 1982790, at *5 (N.D. Cal. July 2, 2007); *Brookstreet Securities Corp. v. Bristol Air Inc.*, No. 02-0863, 2002 U.S. Dist. LEXIS 16784, at *21-22 (N.D. Cal. Aug. 5, 2002).[2]

Here, the issue of arbitrability is an issue for judicial determination because the parties do not contend that they clearly and unmistakably provided otherwise, nor does the Court perceive any such provision.  Rather, the parties agree that the dispositive issue upon which Plaintiff's request for a stay turns is whether Defendants are customers within the meaning of Rule 12200.[3]  The Court therefore turns its attention to the question of whether Plaintiffs make a clear showing of probable success on Plaintiff's contention that Defendants are not Plaintiff's customers as that term is defined in Rule 12200.

The NASD rules define the term "customer" broadly, excluding only brokers and dealers. *See* NASD Code Arb. Proc. 12100 ("A customer shall not include a broker or dealer").  The Ninth Circuit has not further defined this term.  There are, however, two decisions authored by judges of this court and several out-of-circuit cases that guide the Court's analysis as to whether Defendants are customers of Plaintiff Sims and therefore entitled to arbitrate their claims.

In *Brookstreet Securities Corp. v. Bristol Air, Inc.*, the district court found that narrow definitions of the term "customer" have been rejected, but that the term must not be defined so

---

[2] Rule 12200 of the Code is an amended version of former Rule 10301 that went into effect on April 16, 2007.  The cases interpreting and applying Rule 10301 apply with equal force to Rule 12200, as the amendment did not effect any substantive change to the rule.  *See* Comparison Chart of Old and New NASD Arbitration Codes for Customer Disputes, Rule 12200, www.finra.org/web/groups/rules_regs/documents/rule_filing/p018366.pdf.

[3] The Court agrees with the parties that the relevant question is whether Defendants are Plaintiff's "customers" for purpose of Rule 12200.  If Plaintiff shows probable success on this question, then the dispute is not arbitrable because the other requirements of Rule 12200 are met: Plaintiff is a registered broker-dealer and a member of FINRA, Plaintiff has not entered into any written agreements with Defendants with respect to arbitration or any other matter, and Plaintiff does not dispute that this matter arose in connection with its business activities.  (*See* Mem. of P. & A. at 7.)

5

broadly as to upset the reasonable expectations of FINRA members. 2002 U.S. Dist. LEXIS 16784, at *23. The court explained that a customer relationship was typically created between a member firm and a third party when "the individual who solicited the investments or provided investment advice to the purported 'customers' was a representative or employee of the broker." *Id.* at 24. In the cases reviewed by the court, the solicitor was a representative or employee of the broker with whom the investor made an investment. *See id.* at 24-25. The court found that a customer relationship was not established when the investors interacted only with their investment advisor, who maintained an account with the member firm, but was not an employee, agent or registered representative of the firm. *Id.* at 25-26. In *Brookstreet*, the court determined that while the investment advisor himself was a customer of the member firm, the investors were not. *See id.*

In *Goldman Sachs & Co. v. Becker*, the court noted that some courts have held that a direct customer relationship between the member firm and the purported customer is not necessary, so long as there is "some nexus between the investor and the member or associated person." *Goldman Sachs*, 2007 WL 1982790, at *6 (*quoting Malak v. Bear Stearns & Co., Inc.*, 2004 WL 213014, at *4 (S.D.N.Y. 2004). Other courts, the *Goldman* court explained, "have interpreted 'customer' to require the purchase of securities from that NASD member, or to require at least some informal business relationship between the parties." *Id.* The court found that the alleged customer relationship in *Goldman Sachs* was too tenuous because the relationship was based on either the member firm's underwriting of another firm's initial public offering or the member firm's alleged ownership of the purported customers' mortgage. *Id.* The court instead found that the investors' customer relationship, if any, was with the firm that it purchased investment products from or the mortgage servicer itself, but not the member firm that was only tangentially related to these transactions. *Id.*

The out-of-circuit cases cited by the parties similarly set out the parameters of who is, and is not, a "customer." If an investor invests directly with a member firm, then the investor is likely a customer of that firm. *See Oppenheimer v. Neidhardt*, 56 F.3d 352, 357 (2d Cir. 1995). If an "associated person" of the member firm induces, or shepherds, the investment, then the investor is also likely a customer of that firm. *See id.*; *John Hancock Life Insurance v. Wilson*, 254 F.3d 48, 59

6

1  (2d Cir. 2001) (holding that a customer relationship with an associated person is sufficient to
2  establish a customer relationship with the member firm itself); *BMA Financial Services, Inc. v. Guin*,
3  164 F. Supp. 2d 813, 820 (W.D. La. 2001) (same). When, however, the relationship between the
4  parties is more tenuous, courts should determine if there is some form of business relationship that
5  includes some brokerage or investment relationship between the parties. *See Fleet Boston Robertson*
6  *Stephens, Inc. v. Innovex, Inc.*, 264 F.3d 770, 772 (8th Cir. 2001). In this analysis, the courts are
7  guided by the notion that the term "customer" should not be too narrowly construed, nor should the
8  definition upset the reasonable expectations of FINRA members. *See Oppenheimer*, 56 F.3d at 357;
9  *Wheat, First Sec., Inc. v. Green*, 993 F.2d 814, 820 (11th Cir. 1993).

10        Turning to the present case, a review of the key facts is instructive in applying the legal
11  principles annunciated in the cases above. First, the record shows that Defendants did not invest
12  directly with Plaintiff, or with an agent or representative of Plaintiff. *See Oppenheimer*, 56 F.3d at
13  357 (holding that investors who invest directly with a firm or its authorized agent were customers).
14  Rather, each of the Investors were clients of Darden, their investment advisor, and had accounts with
15  the Seibert firm, not with Plaintiff. In addition, Darden was not an employee, agent, representative
16  or associated person of Plaintiff. *See e.g., John Hancock Life Insurance*, 254 F.3d at 59 (holding
17  that a customer relationship with an associated person is sufficient to establish a customer
18  relationship with the member firm itself). Furthermore, none of the Investors had an account or
19  written agreement with Plaintiff or Plaintiff's agents, nor are there allegations that the Investors
20  themselves had any communications, written or oral, with Plaintiff or Drayer, Plaintiff's employee.
21  *See Brookstreet*, 2002 U.S. Dist. LEXIS 16784, at *25-26 (noting that courts have generally found
22  that investors qualify has "customers" when there is a more significant connection between the
23  parties that may include direct communications, advice or agreements). The Investors' alleged
24  connections to Plaintiff were instead through Darden's interactions with Drayer, Plaintiff's
25  employee, and Darden's purchases of Plaintiff's bonds through Seibert, on behalf of the Investors.
26        Thus, Plaintiff has made a showing that Defendants did not have a direct investment
27  relationship with Plaintiff. *See Oppenheimer*, 56 F.3d at 357. Instead, the record before the Court
28  falls within the ambit of cases that have analyzed whether there is some form of business

7

relationship, albeit more tenuous than a direct relationship, that establishes a brokerage or investment relationship between the parties. *See e.g., Brookstreet*, 2002 U.S. Dist. LEXIS 16784, at *25-26 (analyzing a more tenuous relationship and finding no customer relationship when the investors interacted only with their investment advisor, who maintained an account with the member firm, but was not an employee, agent or registered representative of the firm); *see also Fleet*, 264 F.3d at 772; *Oppenheimer*, 56 F.3d at 357. In this regard, Defendants argue that there is a sufficient nexus to establish a customer relationship because Seibert and Darden acted as agents for the Investors and thus Plaintiff's dealings with Seibert and Darden created a customer relationship with the Investors.[4] The Court finds this argument unavailing.

First, Defendants contend that because Seibert acted as Defendants' agent in the pertinent transactions, under Civil Code Section 2330 all rights and liabilities occasioned by Seibert's actions would accrue to the principal. *See* Cal. Civ. Code § 2330 ("all the rights and liabilities which would accrue to the agent from transactions within such limit, if they had been entered into on his own account, accrue to the principal"). Accordingly, Defendants assert that agency principles afford them customer status and a right to arbitrate their claims. The Court disagrees. Seibert, a brokerage firm, is excluded from the definition of a "customer" under Rule 12100. Therefore, even if Defendants showed that Seibert acted as their agent, Defendants do not accrue any right to customer status as a result of an agency relationship with Seibert.

Next, if Darden was acting as an agent for the Investors, his interactions with Seibert and Drayer were not sufficient to establish a customer relationship between the Investors and Plaintiff. Darden's communications with Drayer consisted of the receipt of investment advice and solicitations. Plaintiff has never provided any investment services or other services to any of the Investors and has never received any payments of money from them. Indeed, Plaintiff knew nothing about the Investors and had never heard of them until it was served with the Statement of Claim. While the record shows that Drayer was employed by Plaintiff, the record does not even establish that Drayer was acting in his capacity as an employee of Sims when he solicited Darden. In

---

[4] Defendants additionally argue that the Investors are customers per the dictionary definition, which states that a customer is "one that purchases a commodity or service." (*See* Opp. at 6.) The Court, however, chooses to rely upon case authority in resolving the legal issue presented in this matter and finds it unnecessary to rely upon the cited reference.

8

addition, Defendants cite no case, nor can the Court find any, that supports the proposition that an investment made through a brokerage firm, on advice from an agent at a separate firm, creates a customer relationship between the investor and the latter firm on the basis of agency principles. Instead, the case law supports the conclusion that the reasonable expectations of the parties in this case are that the Investors were customers of Seibert, not Plaintiff. *See e.g., Brookstreet*, 2002 U.S. Dist. LEXIS 16784, at *25-26. Therefore, Plaintiff has made a compelling showing that Drayer's alleged solicitation of Darden's investments did not create a customer relationship between Plaintiff and the Investors.

Finally, though not briefed by Defendants, the Court cannot see how Darden, who has not alleged that he invested funds himself or had an account with Plaintiff or Seibert could be a "customer" of Plaintiff. If he was acting, as is argued here, as an investment advisor solely on behalf of his clients, he is not a customer per Rule 12200. Thus, Plaintiff is likely to succeed in showing that Darden cannot compel Plaintiff to arbitrate his claim.

In sum, therefore, the Court finds that Plaintiff has a probability of success of showing that the relationship between Defendants and Plaintiff was too tenuous to establish a customer relationship and compel arbitration.

Plaintiff also asserts that it will suffer irreparable harm if the arbitration brought by Defendants is not stayed because Plaintiff has no adequate remedy at law to recover the monetary and human capital it would expend defending itself in arbitration. Defendants do not argue otherwise. The Court therefore finds that Plaintiff has shown that it is possible that it will suffer irreparable harm. *See e.g., Maryland Cas. Co. v. Realty Advisory Bd. On Labor Rels.*, 107 F.3d 979, 984-85 (2d Cir. 1977) (time and resources spent in arbitration are not compensable by monetary award under the Arbitration Act); *Textile Unlimited v. A..BMH and Company, Inc*., 240 F.3d 781, 786 (9th Cir. 2001) (holding that the district court's grant of a preliminary injunction to stay arbitration was not clearly erroneous); *see also Brookstreet*, 2002 U.S. Dist. LEXIS 16784, at *27 (finding that a party will suffer irreparable harm if arbitration is not stayed); *Goldman Sachs*, 2007 WL 1982790, at *7 (same). Thus, Plaintiff has made a sufficient showing to warrant the granting of a preliminary injunction to stay the arbitration.

**CONCLUSION**

For the foregoing reasons, the Court **GRANTS** Plaintiff's Motion for Preliminary Injunction and **ORDERS** the pending arbitration proceeding **STAYED** pending a trial on this action. The Court further finds that Plaintiff is not required to post a bond per Rule 65(c) because Defendants did not request that a bond be posted and Defendants did not argue, or offer any evidence showing, that they would suffer hardship as a result of a preliminary injunction. *See Connecticut General Life Insurance Co. v. New Images of Beverly Hills*, 321 F.3d 878, 882-83 (9th Cir. 2003) (holding that if a party affected by an injunction does not request that the Court set a bond or present evidence that a bond is needed, the district court does not abuse its discretion not requiring that a bond is posted).

**IT IS SO ORDERED.**

Dated: March 6, 2008

MARTIN J. JENKINS
UNITED STATES DISTRICT JUDGE